# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HENRY A.; CHARLES B.; CHARLOTTE
B.; LEO C.; VICTOR C.; DELIA D.;
MAIZY D.; JONATHAN D.; LINDA E.;
CHRISTINE F.; OLIVIA G.; SHELDON
H.; MASON I., individually and on
behalf of others so situated,
            *Plaintiffs-Appellants,*

        v.

MICHAEL WILLDEN, Director,
Nevada Department of Health and
Human Services; DIANE COMEAUX,
Administrator, Nevada Division of
Child and Family Services;
VIRGINIA VALENTINE, Clark County
Manager; CLARK COUNTY; TOM
MORTON, Director of Clark County
Department of Family Services,
            *Defendants-Appellees.*

No. 10-17680

D.C. No.
2:10-cv-00528-
RCJ-PAL

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, Chief District Judge, Presiding

Argued and Submitted
February 13, 2012—San Francisco, California

Filed May 4, 2012

Before: Procter Hug, Jr., Betty B. Fletcher, and
Richard A. Paez, Circuit Judges.

Opinion by Judge B. Fletcher

4745

## COUNSEL

Brian R. Matsui, Morrison & Foerster LLP, Washington, DC (argued); Lori A. Schechter, Dorothy L. Fernandez, Jeffrey K. Rosenberg, Morrison & Foerster LLP, San Francisco, California; William Grimm, Leecia Welch, Bryn Martyna, National Center for Youth Law, Oakland, California; Bruno Wolfen-

zon, Gregory M. Schulman, Wolfenzon Schulman & Rolle, Las Vegas, Nevada, for plaintiffs-appellants Henry A., Charles B., Charlotte B., Leo C., Victor C., Delia D., Maizy D., Jonathan D., Linda E., Christine F., Olivia G., Sheldon H., and Mason I.

Margaret G. Foley, Buckley King LPA, Las Vegas, Nevada, for defendants-appellees Virginia Valentine, Tom Morton, and Clark County.

Linda C. Anderson, Chief Deputy Attorney General, Las Vegas, Nevada, for defendants-appellees Michael Willden and Diane Comeaux.

---

**OPINION**

B. FLETCHER, Circuit Judge:

Plaintiff-appellants ("Plaintiffs"), a group of foster children in Clark County, Nevada, appeal the dismissal of their complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] For the reasons that follow, we reverse the dismissal of Counts One, Two, Three, Eight, and Eleven; affirm the dismissal of counts Nine and Ten; and remand for further proceedings.

---

[1]At oral argument, counsel for Defendants suggested that some of the named plaintiffs are no longer in government custody but provided no further information. Without knowing which plaintiffs are no longer in custody and what claims for injunctive relief relate to them, there is simply no way for us to determine whether some claims for injunctive relief are now moot. On remand, any mootness arguments should be brought to the attention of the district court. We note, however, that Plaintiffs' damages claims are not moot in any event. *See Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 872 (9th Cir. 2002) (noting that a live claim for even nominal damages will prevent dismissal for mootness).

## I. BACKGROUND

Plaintiffs brought this action under 42 U.S.C. § 1983 against State and County officials, alleging violations of their substantive due process rights under the Fourteenth Amendment and violations of their federal statutory rights under the Adoption Assistance and Child Welfare Act (CWA), 42 U.S.C. § 670 *et seq.*; the Child Abuse Prevention and Treatment Act (CAPTA), 42 U.S.C. § 5101 *et seq.*; and the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1431 *et seq.*[2] Plaintiffs' action consists of individual claims for damages and injunctive relief and class claims for injunctive relief.

The defendants ("Defendants") named in the action are Clark County; Virginia Valentine, the Clark County Manager; Tom Morton, the Director of Clark County's Department of Family Services; Diane Comeaux, the Administrator of Nevada's Division of Child and Family Services; and Michael Willden, the Director of Nevada's Department of Health and Human Services. The complaint also lists as "John Doe" defendants ten caseworkers and ten supervisors for Clark County's Department of Family Services. According to the complaint, the State of Nevada was responsible for providing foster care services until October 2004, when that responsibility was transferred to Clark County. The State retains responsibility for supervision and oversight of Clark County's foster care system, including the County's compliance with state and federal law.[3]

The complaint alleges that Clark County's foster care sys-

---

[2] Plaintiffs also raised claims under the supremacy clause, which they voluntarily dismissed, and several pendent state law claims, which the district court dismissed pursuant to 28 U.S.C. § 1367(c).

[3] For the purposes of reviewing a Rule 12(b)(6) dismissal, we accept as true all well-pleaded facts in the complaint. *ASW v. Oregon*, 424 F.3d 970, 974 (9th Cir. 2005).

tem is plagued by systemic failures that result in violations of the rights guaranteed to foster children by federal statutes and the Due Process clause of the Fourteenth Amendment. The specific allegations include the failure to provide caseworkers with even basic training; the failure to provide foster children and their foster parents with case plans and medical records; the failure to provide foster children with necessary medical care; the failure to provide foster children with guardians ad litem; the failure to investigate reports of abuse and neglect in foster homes; the failure of Clark County to incorporate state and federal requirements into its child welfare policies; and the failure of the State to ensure that Clark County is operating its foster care system in compliance with federal law.

The complaint's allegations also describe how these systemic failures have injured the named plaintiffs. For the sake of brevity, we summarize only a few examples.

The alleged failure to provide adequate medical care has had serious consequences for several of the named plaintiffs. Henry A. was forced to change treatment providers more than ten times, but his medical records were not transferred properly. As a result, Henry was given a dangerous combination of psychotropic medications and was hospitalized in an intensive care unit for two weeks, on the brink of organ failure. Upon release from the hospital, Henry was administered the same medications again and returned to the ICU.

When Jonathan D. became seriously ill with an impacted colon, the County failed to approve a colonoscopy or other treatment measures, despite repeated requests from Jonathan's doctor and his foster parent. Without the County's consent, Jonathan's doctor was forced to wait until Jonathan's condition became life-threatening, justifying emergency surgery without the County's permission. By that point, Jonathan had been in severe pain for months.

Other plaintiffs were injured by the failure to provide foster children and their foster parents with the records and docu-

mentation required by federal law. For example, when Olivia G. was placed with a foster parent after being discharged from a psychiatric facility, her foster parent did not receive the authorization to fill her prescriptions, forcing Olivia to go through a painful withdrawal.

Finally, some plaintiffs were left in foster homes without any intervention despite their reports of abuse and neglect. According to the complaint, Defendants failed to investigate Linda E.'s reports of physical abuse in her foster home; placed Leo C. and Victor C. in a foster home that had a known history of neglect; and placed Mason I. in an out-of-state facility despite numerous reports of patient abuse there and Mason's own complaints of sexual abuse.

## II.   JURISDICTION & STANDARD OF REVIEW

These factual allegations, among others, form the basis for the parts of the complaint that are at issue in this appeal: Counts One, Two, and Eleven, based on the Fourteenth Amendment to the United States Constitution; Counts Three and Eight, based on the CWA; Count Nine, based on CAPTA; and Count Ten, based on CAPTA and the IDEA.[4] The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). The district court dismissed these claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and entered final judgment in favor of Defendants on October 27, 2010. Plaintiffs filed a timely notice of appeal, and we have jurisdiction under 28 U.S.C. § 1291.

We discuss each claim in detail below. We review de novo the district court's decision to grant Defendants' motion to dismiss under Rule 12(b)(6). *ASW*, 424 F.3d at 974. "We accept as true all well pleaded facts in the complaint and construe them in the light most favorable to the nonmoving

---

[4]The dismissal of the remaining counts has not been challenged on appeal. *See supra* note 2.

party." *Id.* We also review whether the district court abused its discretion by dismissing the complaint without granting leave to amend. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

## III.  DISCUSSION

### A.  Substantive Due Process Claims

Generally, "the Fourteenth Amendment's Due Process Clause . . . does not confer any affirmative right to governmental aid" and "typically does not impose a duty on the state to protect individuals from third parties." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011) (citations and alterations omitted). There are, however, two exceptions to this rule. First, there is the "special relationship" exception — when a custodial relationship exists between the plaintiff and the State such that the State assumes some responsibility for the plaintiff's safety and well-being. *Id.* at 971 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198-202 (1989)). Second, there is the "state-created danger exception" — when "the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known and obvious danger[.]' " *Id.* at 971-72 (quoting *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)). "If either exception applies, a state's omission or failure to protect may give rise to a § 1983 claim." *Id.* at 972.

Plaintiffs here have raised claims under both exceptions, arguing (1) that Defendants have a custodial relationship with foster children and have failed to provide adequate safety and medical care, and (2) that Defendants have affirmatively placed some of the children in danger by putting them in foster care placements that were known to be abusive.

#### 1.  *Special Relationship Exception (Counts One and Eleven)*

Counts One and Eleven of the complaint allege that Defendants have violated Plaintiffs' "right to be free from harm

while involuntarily in government custody and their right to medical care, treatment, and services." Count One seeks damages and injunctive relief for the individual plaintiffs and Count Eleven seeks injunctive relief on behalf of a class of foster children who have failed to receive early intervention services that they are entitled to under federal law.

Both counts proceed to provide more detailed factual allegations. Count One provides a list of the conduct that allegedly has violated Plaintiffs' rights to adequate safety and medical care:

(a) failure to adequately provide medical, dental, and mental health services, including but not limited to standardized periodic health screenings and treatments, medical services for maximum reduction of physical or mental disability, and monitoring of, administration, and use of psychotropic drugs by foster children;

(b) failure to inform caregivers of essential information;

(c) failure to conduct legally required visits with foster children;

(d) failure to adequately respond to reports of abuse;

(e) failure to ensure adequacy of relative caregiver placements; and

(f) failure to adequately inspect out of state facilities and monitor treatment and services provided to foster children placed in out of state facilities.

Count One also incorporates the detailed examples of how Defendants failed to provide adequate medical care and safety to the individual plaintiffs, such as the failure to approve Jon-

athan's necessary medical treatment despite knowledge that he was seriously ill; the failure to provide Olivia's foster parents with the information and authorization to fill her prescriptions; and the failure to respond to reports of abuse and neglect at Linda and Mason's foster care placements. Count Eleven alleges that Defendants' routine failure to refer eligible children to early intervention services amounts to a denial of adequate medical care.

The district court dismissed Counts One and Eleven after concluding that Defendants were entitled to qualified immunity because Plaintiffs failed to allege a violation of a clearly established constitutional right. The district court explained that while the State must "provide individuals in state custody with their basic human needs," the specific examples of medical care and services listed by Plaintiffs were not clearly established constitutional rights.

**[1]** This conclusion is plainly wrong with respect to Plaintiffs' damages claim against Clark County and Plaintiffs' claims for injunctive relief. "Qualified immunity shields federal and state *officials* from *money damages* unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (emphasis added). Qualified immunity is not available as a defense in § 1983 cases "against a municipality" or "against individuals where injunctive relief is sought instead of or in addition to damages." *Pearson v. Callahan*, 555 U.S. 223, 242 (2009). Defendants do not dispute the law on this point. We therefore reverse the district court's dismissal of Count Eleven, which seeks only injunctive relief, and reverse the dismissal of Count One with respect to the claims for injunctive relief and the damages claim against Clark County. Qualified immunity simply does not apply to these claims.[5]

---

[5]For the first time on appeal, the County defendants argue that dismissal against Clark County is proper because Plaintiffs have failed to suffi-

Qualified immunity is, however, a possible defense to the claims for damages against the individual defendants in Count One. Even if a complaint sufficiently alleges that a government official violated a federal constitutional or statutory right, that official is entitled to qualified immunity from money damages if the right was not "clearly established" at the time of the challenged conduct. *See al-Kidd*, 131 S. Ct. at 2080. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 2083 (internal quotation marks and alterations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted).

**[2]** In this case, the district court's qualified immunity analysis was too narrow. The district court looked at Plaintiffs' detailed factual allegations and essentially determined that Defendants were entitled to qualified immunity because the "very action[s] in question" had not "previously been held

---

ciently plead that the violations of their constitutional rights were pursuant to a policy, practice, or custom as required by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Although ordinarily we may consider affirming dismissal on any ground supported by the record, *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011), that discretion "extends to issues raised in a manner providing the district court an opportunity to rule on it." *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 974 (9th Cir. 2010). In any event, we note that the complaint does make specific factual allegations regarding the County's policies and customs, including a custom of failing to provide even basic training to caseworkers before assigning them caseloads; County policies that do not incorporate State and federal requirements; and a custom of failing to share necessary medical information between State and County officials. *Compare Dougherty*, 654 F.3d at 900-01.

unlawful." *See id.* Instead, the district court should have (1) determined the contours of a foster child's clearly established rights at the time of the challenged conduct under the "special relationship" doctrine of substantive due process, and (2) examined whether a reasonable official would have understood that the specific conduct alleged by Plaintiffs violated those rights. *See al-Kidd*, 131 S. Ct. at 2083. Using the correct analysis, we conclude that Plaintiffs have alleged violations of their clearly established constitutional rights, and the individual defendants are not entitled to qualified immunity at this stage of the litigation.

**[3]** It is clearly established that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199-200. When the State asserts this type of custody over a person "and at the same time fails to provide for his basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by . . . the Due Process clause." *Id.* at 200.

**[4]** It is also clearly established that this special relationship doctrine applies to children in foster care. We recently clarified that it has been clearly established since at least 1996 that foster children have "a federal constitutional right to state protection" while they remain in the care of the State. *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 846-47 (9th Cir. 2010). Our circuit recognized the State's duty to protect foster children as early as 1992, when we observed that "[o]nce the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Lipscomb v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992).

**[5]** All of the conduct challenged here occurred after 1996, so there is no question that a foster child's right to the basic

needs identified in *DeShaney* — food, clothing, shelter, medical care, and reasonable safety — was clearly established "at the time of the challenged conduct." *See al-Kidd*, 131 S. Ct. at 2080. We can further clarify the contours of this right by looking to our recent decision in *Tamas*.

First, *Tamas* itself held that this right encompasses "a foster child's liberty interest in social worker supervision and protection from harm inflicted by a foster parent." 630 F.3d at 842. *Tamas* also clarified that the proper standard for determining whether a foster child's due process rights have been violated is "deliberate indifference," the same standard applied to substantive due process claims by prisoners. *Id.* at 844-45. This standard "requires an objective risk of harm and a subjective awareness of that harm." *Id.* at 844 (quoting *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010)). To be more specific, it requires (1) "a showing of an objectively substantial risk of harm"; and (2) "a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed" and (a) "the official actually drew that inference" or (b) "that a reasonable official would have been compelled to draw that inference." *Id.* at 845. "[T]he subjective component may be inferred from the fact that the risk of harm is obvious." *Id.* (internal quotation marks and citation omitted).

**[6]** Second, we can look to the clearly established law from other circuits cited by the *Tamas* court. Those cases demonstrate, for example, that a foster child's due process rights are violated when a state official exhibits deliberate indifference to a child's serious medical needs, *Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 291 (8th Cir. 1993); to suspected physical abuse in a foster home, *Hernandez v. Tex. Dep't of Protective and Regulatory Servs.*, 380 F.3d 872, 881 (5th Cir. 2004); and to suspected sexual abuse in a foster home, *J.H. v. Johnson*, 346 F.3d 788, 791 (7th Cir. 2003). Because the substantive due process rights of foster children are analogous to those of prisoners, *see Tamas*, 630 F.3d at

844-45, we can also look to our prisoner cases to further define what constitutes a "serious medical need." Those cases, for example, have held that ignoring the instructions of a treating physician, or failing to provide a prisoner with necessary psychotropic medication, can amount to deliberate indifference to serious medical needs. *Wakefield v. Thompson*, 177 F.3d 1160, 1164-65 (9th Cir. 1999).

**[7]** Having examined the relevant contours of a foster child's clearly established due process rights to adequate safety and medical care, we conclude that a reasonable official would have understood that at least some of the specific conduct alleged by Plaintiffs violated those rights. Count One of the complaint alleges generally that Defendants exhibited deliberate indifference and violated the children's rights to "be free from harm while involuntarily in government custody and their right to medical care"; alleges more specifically that Defendants failed to provide adequate medical care, monitor the administration of medication, or respond to reports of abuse; and provides detailed factual allegations relating to the individual plaintiffs. A reasonable official would have understood that failing to authorize Jonathan's medical treatment despite knowledge of his serious illness and repeated requests from his treating physician amounted to deliberate indifference to a serious medical need. A reasonable official would also have understood that failing to respond to Linda's reports of physical abuse in her foster home or the numerous reports of abuse in Mason's out-of-state placement would constitute deliberate indifference to the children's right to safety in their foster care placements.

**[8]** It may be that Plaintiffs cannot prove these allegations, or that they can only prove some of their less serious allegations, such as the failure to provide standardized periodic health screenings. If that turns out to be the case, the individual defendants can again raise the defense of qualified immunity at a later stage in the proceedings. *See Ortiz v. Jordan*, 131 S. Ct. 884, 889 (2011). But at this stage, when we accept

as true all well pleaded facts in the complaint, Plaintiffs have alleged violations of their clearly established constitutional rights, and qualified immunity is not appropriate. We reverse the district court's dismissal of the damages claims in Count One.

## 2. State-Created Danger Exception (Count Two)

**[9]** The State can also be held liable under the Fourteenth Amendment's Due Process clause for failing to protect an individual from harm by third parties "where the state action 'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (quoting *DeShaney*, 489 U.S. at 197). To determine whether an official affirmatively placed an individual in danger, we ask: (1) whether any affirmative actions of the official placed the individual in danger he otherwise would not have faced; (2) whether the danger was known or obvious; and (3) whether the officer acted with deliberate indifference to that danger. *Id.* at 1062-64.

In Count Two of their complaint, Plaintiffs allege that Defendants

> act[ed] with deliberate indifference to known or obvious danger in removing Plaintiffs from their homes and placing them in the care of foster parents, including in the care of relative caregivers and out of state facilities and homes, who were unfit to care for them and posed an imminent risk of harm to Plaintiffs' safety.

The complaint also contains more detailed factual allegations, including that Defendants placed Leo and Victor in a foster home that had a known history of neglect; that Defendants required Mason to have unsupervised visits with his grandpar-

ents despite having knowledge that they had abused him; and that Defendants placed Mason in an out-of-state facility that had a known history of chronic neglect and abuse.

The district court dismissed Count Two for failure to state a claim under the state-created danger doctrine, and ruled in the alternative that Defendants were entitled to qualified immunity because Plaintiffs' rights under the state-created danger doctrine were not clearly established. Citing repeatedly to the dissent from denial of rehearing en banc in *Kennedy v. City of Ridgefield*, rather than the opinion itself, the district court reasoned that the complaint did not sufficiently allege that Defendants "did more than simply expose the plaintiff to a danger that already existed" because Defendants merely "place[d] foster children into an already broken system."

[10] The district court's reasoning was erroneous. The test that the district court took from the dissent from denial in *Kennedy* — that the official must do more than "expose the plaintiff to a danger that already existed" — is not the law of this circuit. *Compare* 440 F.3d 1091, 1093 (9th Cir. 2006) (Tallman, J., dissenting from denial of rehearing en banc) *with* 439 F.3d at 1061 (opinion of the court). Such a test would render the state-created danger doctrine meaningless. As discussed above, this doctrine provides an exception to the general rule that the Fourteenth Amendment does not impose a duty on the State to protect individuals from third parties. Thus, by its very nature, the doctrine only applies in situations where the plaintiff was directly harmed *by a third party* — a danger that, in every case, could be said to have "already existed." The "dangers" examined in our previous cases — such as a vengeful, unstable neighbor, *see Kennedy*, 439 F.3d 1055; a violent, predatory inmate, *see L.W.*, 92 F.3d 894; or a rapist prowling a high-crime area late at night, *see Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989) — already "existed" before the plaintiffs were harmed by them. But the point of the state-created danger doctrine is that the affirmative actions

of a state official "create[d] or expose[d] an individual to a danger *which he or she would not have otherwise faced.*" *Kennedy*, 439 F.3d at 1061 (opinion of the court) (emphasis added).

**[11]** That is precisely what Plaintiffs have alleged here. They allege that Defendants knew of the danger of abuse and neglect that Plaintiffs faced in certain foster homes and acted with deliberate indifference by exposing Plaintiffs to that danger anyway. This is sufficient to state a claim under the controlling opinion in *Kennedy*. The fact that the dangerous foster homes "already existed" is irrelevant.

**[12]** Moreover, we have already held that the state-created danger doctrine applies to placing a foster child in a home where there is a known danger of abuse. *Tamas*, 630 F.3d at 843-44. As we explained in *Tamas*, the State's approval of a foster care placement despite reports of suspected abuse creates a danger of abuse that the foster child would not otherwise have faced. *Id.* We therefore reverse the district court's dismissal of Count Two for failure to state a claim under the state-created danger doctrine. Because *Tamas* also held that these rights were clearly established, we reject the district court's conclusion that qualified immunity provides an alternative ground for dismissal. *See id.* at 837-38, 846 (holding that the due process rights of foster children are clearly established and applying the state-created danger doctrine to foster care licenses issued in 1997 and 1999).

### 3.  *Liability of the State Officials*

The State defendants also argue that, with respect to them, the complaint fails to state a claim for substantive due process violations because it does not adequately allege that the State officials had a custodial relationship with the foster children or that they are liable as supervisors.[6] Although the district

---

[6]The County defendants did not raise this argument in their motion to dismiss and have not raised it before this court.

court did not address this argument, the State raised it below, and we may affirm the district court's dismissal on any ground supported by the record. *Dougherty*, 654 F.3d at 900.

**[13]** First, the State defendants argue that they cannot be held liable under the "special relationship" exception in Count One because the plaintiff foster children are technically in the custody of Clark County. This argument is not persuasive. The complaint alleges that defendant Willden has "responsibility for ensuring the provision of child welfare services throughout the state" and that defendant Comeaux leads the agency which "must evaluate all child welfare services provided throughout the State and take corrective action against any agency providing child welfare services which is not complying with any applicable laws, regulations, or policies." Furthermore, the complaint also alleges that at least two plaintiffs, Henry and Linda, were in the custody of the State before the foster care system was transferred to Clark County. This is sufficient to plead a custodial relationship between the foster children and the State defendants.

Second, the State defendants argue that plaintiffs have failed to state a claim against them for supervisory liability. We recently reaffirmed that a plaintiff may state a claim under § 1983 against a supervisor for deliberate indifference. *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). "A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Id.* at 1207 (internal quotation marks and citation omitted). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)). In order to adequately plead such a

claim, "allegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Id.* at 1216. These factual allegations "must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.*

After thoroughly examining the plaintiffs' complaint, we agree that there are few specific allegations against the State defendants. Most of the allegations in the complaint simply reference "Defendants," without specifying whether the conduct at issue was committed by the named State officials, County officials, or the "John Doe" supervisors or caseworkers. For many of the detailed factual allegations, such as the failure to respond to a particular report of abuse or authorize a particular medical procedure, it is implausible to suggest that Willden or Comeaux personally committed the alleged violation.

The allegations that do expressly reference the State defendants are too general to state a claim for supervisory liability. In *Starr v. Baca*, the plaintiff alleged that Sheriff Baca himself had been given clear notice by the Department of Justice of the specific unconstitutional conditions in the jails; that the Sheriff received numerous reports documenting inmate violence caused by the unconstitutional conduct of his deputies; and that the Sheriff ultimately acquiesced in these constitutional violations. *See* 652 F.3d at 1208-10.

In contrast, the allegations here claim that the agencies directed by Willden and Comeaux have oversight responsibility for Clark County's foster care system and are required to ensure that Clark County is complying with state and federal law. The complaint also alleges that all of the defendants had knowledge of independent reports documenting the systemic failures of foster care in Nevada. But it does not allege that

Willden or Comeaux had any personal knowledge of the specific constitutional violations that led to Plaintiffs' injuries, or that they had any direct responsibility to train or supervise the caseworkers employed by Clark County.

The allegations that come closest to pleading personal involvement by Willden and Comeaux concern the failure to provide medical records to the children and their foster parents in order to facilitate their medical care. Paragraphs 27 and 28 allege that Willden is responsible for "ensuring county compliance with all federal mandates of the Medicaid program" and that Comeaux is "responsible for administering the Medicaid program with respect to children in the child welfare system." Paragraph 42 alleges that "State Defendants . . . are responsible for the management and day-to-day operation of Nevada's Children's Mental Health Services program." Finally, Paragraph 59 alleges that the State defendants fail to share the medical records from the State's Medicaid database and the Mental Health Services program with the County defendants, which in turn prevents County employees from sharing that information with foster parents.

When read together, these allegations suggest that there may be a causal connection between the State defendants' failure to share these medical records and the injuries suffered by plaintiffs such as Henry, who received a dangerous combination of prescription drugs because his medical records were not given to his treatment providers.

But even if the complaint in its current form fails to state a claim against the State officials for substantive due process violations, the district court abused its discretion by failing to give the plaintiffs an opportunity to amend their complaint. "[W]e have repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez*, 203 F.3d at 1130 (internal quotation marks omitted). Here, Plaintiffs

offered to amend their complaint if necessary in their response to the motion to dismiss, but the district court did not grant leave to amend and did not provide any reasons for its decision.

[14] As we have already concluded, the complaint adequately pleads violations of Plaintiffs' clearly established substantive due process rights, and it plausibly suggests an entitlement to relief from at least some of the defendants. Where the complaint falls short in some places is tying its factual allegations to particular defendants. But this type of deficiency can likely be cured by amending the complaint, and there is certainly no evidence to suggest that allowing amendment would be futile.

[15] Therefore, on remand, Plaintiffs should be given an opportunity to amend their substantive due process claims. We note that in any future proceedings in the district court, each defendant's liability must be analyzed individually using the proper standard, whether that individual is a line-level caseworker, a supervisory official, or a municipality. *See Tamas*, 630 F.3d at 847.

## B. Federal Statutory Claims

[16] Section 1983 can also be used to enforce federal statutes. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). For a statutory provision to be privately enforceable, however, it must create an individual right. *See id.* ("In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*.").

*Blessing* established a three-prong test for determining whether a federal statute creates an individual right. "The *Blessing* test requires: 1) that Congress intended the statutory provision to benefit the plaintiff; 2) that the asserted right is not so 'vague and amorphous' that its enforcement would

strain judicial competence; and 3) that the provision couch the asserted right in mandatory rather than precatory terms." *Watson v. Weeks*, 436 F.3d 1152, 1158 (9th Cir. 2006) (citing *Blessing*, 520 U.S. at 340-41). In *Gonzaga University v. Doe*, the Supreme Court clarified that the first prong of the *Blessing* test is meant to determine whether Congress "unambiguously conferred" a federal right. 536 U.S. 273, 283 (2002). This requires "rights-creating language," meaning that the text of the statute "must be phrased in terms of the persons benefited." *Id.* at 284, 284 n.3 (quotation marks and citations omitted).

If a statutory provision satisfies the *Blessing* test, it is presumptively enforceable through § 1983. *Watson*, 436 F.3d at 1158 (citing *Blessing*, 520 U.S. at 341). This presumption is rebutted "if Congress expressly or impliedly foreclosed enforcement under section 1983." *Id.* "[A]n implied foreclosure occurs if Congress created 'a comprehensive enforcement scheme that is incompatible with individual enforcement.' " *Id.* at 1158-59 (quoting *Blessing*, 520 U.S. at 341).

Here, the plaintiffs seek to enforce four sets of federal statutory provisions through § 1983: the case plan provisions of the CWA, the records provisions of the CWA, the guardian ad litem provision of CAPTA, and the early intervention services provisions of CAPTA and the IDEA. All of these are spending statutes; the State of Nevada has agreed to administer its foster care system in accordance with these federal laws in return for financial assistance from the federal government. The district court dismissed these claims on the basis that none of the provisions are privately enforceable.[7]

---

[7]The district court's order occasionally refers to these claims as "statutory, constitutional violations" and explains that Defendants are entitled to qualified immunity because it is not "clearly established" that the statutory provisions at issue are privately enforceable. These statements are incorrect. First, enforcement through § 1983 does not transform a statutory

### 1. CWA: Case Plan Provisions (Count Eight)

Count Eight of the complaint seeks injunctive relief for a class of children who have not received a case plan as required by the CWA. The case plan provisions of the CWA are codified at 42 U.S.C. §§ 671(a)(16) and 675(1). Section 671(a)(16) states that:

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan . . . .

Section 675(1) provides a detailed definition of what a case plan must include, such as the child's health and educational records, a description of the child's permanency plan, and a plan for ensuring the child's educational stability.

The district court concluded that these provisions do not contain sufficient "rights-creating language" to satisfy the first prong of the *Blessing* test. We disagree and join the majority of federal courts in holding that the case plan provisions are enforceable through § 1983. *See, e.g.*, *L.J. v. Massinga*, 838 F.2d 118, 123 (4th Cir. 1988); *Lynch v. Dukakis*, 719 F.2d 504, 512 (1st Cir. 1983); *Sam M. v. Chafee*, 800 F. Supp. 2d 363, 386-88 (D.R.I. 2011); *Connor B. v. Patrick*, 771 F. Supp. 2d 142, 170-72 (D. Mass. 2011); *Kenny A. v.*

right into a constitutional right. Section 1983 provides for enforcement of rights guaranteed by federal statutes alone. *See Blessing*, 520 U.S. at 340. Second, whether a federal statute is privately enforceable and whether an official is entitled to qualified immunity for a violation of that statute are two separate inquiries. There need not be "clearly established law" showing that a statute is privately enforceable. *See, e.g.*, *ASW*, 424 F.3d 970 (considering as a matter of first impression whether §§ 671(a)(12) and 673(a)(3) of the CWA are privately enforceable).

*Perdue*, 218 F.R.D. 277, 292-93 (N.D. Ga. 2003); *Brian A. v. Sundquist*, 149 F. Supp. 2d 941, 946-49 (M.D. Tenn. 2000); *Jeanine B. v. Thompson*, 877 F. Supp. 1268, 1283-84 (E.D. Wis. 1995); *B.H. v. Johnson*, 715 F. Supp. 1387, 1402 (N.D. Ill. 1989). *But see Carson P. v. Heineman*, 240 F.R.D. 456, 544 (D. Neb. 2007); *Olivia Y. v. Barbour*, 351 F. Supp. 2d 543, 562 (S.D. Miss. 2004); *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 489-90 (D.N.J. 2000).

**[17]** Section 671(a)(16) unambiguously requires the State to provide for the development of a case plan "for each child." As the Massachusetts district court wrote recently in *Connor B.*, rights-creating language "is readily discernible" in § 671(a)(16) because it "expresses a clear mandate by using the term 'shall' " and "discusses how the state must distribute benefits to *each child*." 771 F. Supp. 2d at 171. "Plainly, these directives are both couched in mandatory terms and are unmistakably focused on the benefitted class, *i.e.*, foster children." *Id.*

Our court's precedent also supports this conclusion. We have concluded in two different cases that other provisions of the CWA contain rights-creating language.[8] In *ASW*, we held that §§ 671(a)(1) and 673(a)(3) create a right to individualized adoption assistance payment determinations and that § 671(a)(12) creates a right to a hearing when adoption assistance payments are reduced. 424 F.3d at 975-79. In *California State Foster Parent Association v. Wagner*, we held that §§ 672(a) and 675(4)(A) create a right to foster care maintenance payments that cover certain enumerated costs. 624 F.3d 974, 978-82 (9th Cir. 2010). Both of these decisions recognized the importance of language phrasing the benefit in terms of "each child," *see id.* at 979-81, or "each family," *see ASW*, 424 F.3d at 976 (citing *Rabin v. Wilson-Coker*, 362 F.3d 190, 201 (2d Cir. 2004)). As in those cases, the reference

---

[8]These decisions are not dispositive because we must examine each provision separately rather than the statute as a whole. *ASW*, 424 F.3d at 977.

here to a case plan "for each child" focuses squarely on the protected individual, rather than an aggregate interest or a regulated entity. *See Wagner*, 624 F.3d at 980 (citing *Gonzaga*, 536 U.S. at 288-89).

Defendants' argument to the contrary is not persuasive. Defendants maintain that "Congress only required the State to have a plan to 'develop' a case plan for each child." But as we recognized in *ASW*, Congress has directed that statutory provisions within the Social Security Act should not "be deemed unenforceable because of its inclusion in a section . . . requiring a State plan or specifying the required contents of a State plan." 42 U.S.C. § 1320a-2; *ASW*, 424 F.3d at 977 n.11.[9] We conclude that the first *Blessing* factor weighs in favor of an enforceable right.

[18] The second and third *Blessing* factors also show that the case plan provisions are presumptively enforceable. The requirement that each child have a case plan is not "so vague and amorphous that its enforcement would strain judicial competence." *Watson*, 436 F.3d at 1158 (internal quotation marks omitted). The definition provided in § 675(1) describes exactly what a case plan must include; as in *ASW*, "there is no ambiguity as to what [the state is] required to do[.]" 424 F.3d at 976. In *Wagner*, we held that another detailed definition in § 675, which provided an itemized list of what expenses "foster care maintenance payments" must cover, satisfied the second *Blessing* prong. 624 F.3d at 981. We con-

---

[9]This statute is known as the "*Suter* fix." In *Suter v. Artist M.*, 503 U.S. 347 (1992), the Supreme Court held that § 671(a)(15) of the CWA, which requires a State to make "reasonable efforts" to reunify families, is not privately enforceable. The Court relied in part on the placement of that provision in a part of the statute detailing the requirements of a State plan. The "*Suter* fix" overturned that reasoning with respect to all provisions in Chapter 7 of Title 42 (the Social Security Act) without overturning the specific holding that § 671(a)(15) is not privately enforceable. The CWA is also known as Title IV-E of the Social Security Act. *Wagner*, 624 F.3d at 978.

clude that § 675(1) does so as well. Finally, we have already determined that the repeated use of the word "shall" in the CWA shows that the statute is written in mandatory rather than precatory terms. *Id.* at 982.

We now turn to whether the presumption that the case plan provisions are enforceable is rebutted by Congressional action that has "expressly or impliedly foreclosed enforcement under section 1983[.]" *Watson*, 436 F.3d at 1158. In *Wagner*, we recognized that the CWA provides no administrative forum through which aggrieved foster children or parents can seek redress, which weighs in favor of enforcement through § 1983. 624 F.3d at 982. Here, however, Defendants argue that because Congress created an *express* cause of action to enforce § 671(a)(18), it could not have intended the other sub-sections of § 671(a) to be privately enforceable. *See Charlie H.*, 83 F. Supp. 2d at 489. The district court also relied on this reasoning. This argument, however, has been implicitly rejected by our holding in *ASW* that § 671(a)(12) creates an enforceable right. Furthermore, because the express cause of action created for § 671(a)(18) is actually *broader* than § 1983, it does not suggest an intent to limit § 1983 enforcement. *See Joseph A. v. Ingram*, 275 F.3d 1253, 1264 (10th Cir. 2002); *cf. ASW*, 424 F.3d at 978 ("[T]he dispositive issue is whether the private remedy provided by statute is more restrictive than those available through a § 1983 action, such that the § 1983 action would function as an end run around the enforcement mechanism Congress provided.").

**[19]** We conclude that the case plan provisions of the CWA, codified at §§ 671(a)(16) and 675(1), are enforceable through § 1983. We therefore reverse the district court's dismissal of Count Eight.

### 2.   *CWA: Records Provisions (Count Three)*

Count Three is a claim for injunctive relief and damages on behalf of the individual plaintiffs. It seeks to enforce the

requirement that a State provide updated health and education records to foster parents as part of a "case review system." These provisions are codified at 42 U.S.C. §§ 671(a)(16), 675(1), and 675(5)(D).

As it does with respect to a case plan, § 671(a)(16) requires a State to provide for a "case review system" for each child. Section 675(5)(D) defines "case review system" to include "a procedure for assuring that . . . a child's health and education record . . . is reviewed and updated, and a copy of the record is supplied to the foster parent or foster care provider with whom the child is placed, at the time of each placement of the child in foster care." Section 675(1)(C) outlines the detailed information that must be included in a child's health and education record.

The district court analyzed the records provisions of the CWA along with the case plan provisions and concluded that the records provisions were also not enforceable. The district court adopted the reasoning of the Eleventh Circuit in *31 Foster Children v. Bush*, which held that the language describing a case review system as "a procedure for assuring" that a foster child has accurate health and education records gives the provision "an aggregate or system wide focus instead of one that indicates concern with whether the needs of any particular child are met." 329 F.3d 1255, 1272 (11th Cir. 2003).

**[20]** We disagree with this analysis and instead join the federal courts that have found the records provisions of the CWA to be privately enforceable along with the case plan provisions. *See, e.g.*, *Lynch*, 719 F.2d at 512; *Kenny A.*, 218 F.R.D. at 291-92; *Brian A.*, 149 F. Supp. 2d at 946-49. We are persuaded by the statute's repeated focus on the individuals benefitted by §§ 671(a)(16) and 675(5)(D): A case review system must be provided with respect to each child; the child's health and education record must be provided to the foster parent; and this must happen at the time the child is placed in foster care. As in *Wagner*, the "focus on individual

foster children," and the language "designating foster parents" to receive a benefit on their foster child's behalf, "together unambiguously reflect Congress's intent" that the records provisions benefit individual foster children and parents. 624 F.3d at 981. Furthermore, like the case plan provisions, the records provisions are couched in mandatory terms and contain detailed, concrete requirements that are capable of judicial enforcement.[10] To conclude otherwise would be inconsistent with our decisions in *ASW* and *Wagner*, as well as our analysis of the case plan provisions above.

**[21]** Defendants argue that the district court's decision is supported by a footnote in *ASW*, which distinguished *31 Foster Children* by noting that unlike § 673(3), the provision at issue in *ASW*, the statutory text of § 675(5) alone does not mention "a right . . . to have medical and education backgrounds provided to caregivers[.]" 424 F.3d at 977 n.12. We agree with Plaintiffs, however, that this footnote has little significance because *ASW* did not consider § 675(5) in the context of related provisions such as § 671(a)(16) and § 622(b)(8)(A)(ii). We conclude that, like the case plan provisions, the records provisions can be enforced through § 1983, and we reverse the district court's dismissal of Count Three.

### 3. *CAPTA: Guardian ad litem provisions (Count Nine)*

Count Nine of the complaint seeks injunctive relief on behalf of a class of foster children who have not been appointed guardians ad litem. It seeks to enforce the guardian ad litem provision of CAPTA, codified at 42 U.S.C. § 5106a(b)(2)(B)(xiii), which provides that:

---

[10]Additional evidence of Congress's intent to create an enforceable right can be found at 42 U.S.C. § 622(b)(8)(A)(ii), which requires each State to assure that it is "operating" a case review system "for each child receiving foster care under the supervision of the State." *See, e.g.*, *Kenny A.*, 218 F.R.D. at 292-93; *Brian A.*, 149 F. Supp. 2d at 947; *cf. 31 Foster Children*, 329 F.3d at 1271 n.8. *But see Charlie H.*, 83 F. Supp. 2d at 485-89.

A State plan . . . shall contain a description of the activities that the State will carry out using amounts received under the grant . . . including . . . an assurance in the form of a certification by the Governor of the State that the State has in effect and is enforcing a State law, or has in effect and is operating a statewide program . . . that includes provisions and procedures requiring that in every case involving a victim of child abuse or neglect which results in a judicial proceeding, a guardian ad litem . . . shall be appointed to represent the child in such proceedings . . . .[11]

As the district court observed, Nevada does have a law directing state courts to appoint a guardian ad litem for every eligible child. *See* Nev. Rev. Stat. § 432B.500(1) ("After a petition is filed that a child is in need of protection . . . the court shall appoint a guardian ad litem for the child."). But courts do not always order these appointments, because Clark County does not have enough guardian ad litem volunteers. *See* Nev. Rev. Stat. § 432B.500(2) ("No compensation may be allowed a person serving as a guardian ad litem pursuant to this section."). Plaintiffs thus seek an injunction compelling the State and County defendants to "make it possible for state courts to appoint a guardian ad litem in every case." The district court held that the guardian ad litem provision of CAPTA was not privately enforceable and that, in the alternative, abstention was warranted under the doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971).

**[22]** As best we can tell, no court has specifically addressed whether the guardian ad litem provision of CAPTA is enforceable through § 1983, and no federal appellate court has considered whether any provision of the current version of CAPTA is privately enforceable. As a matter of first

---

[11]At the time the complaint was filed, this provision was codified at 42 U.S.C. § 5106a(b)(2)(A)(xiii).

impression, we conclude that the guardian ad litem provision does not create an individual right enforceable through § 1983.

The Sixth Circuit and the D.C. Circuit have held that an earlier version of CAPTA is not privately enforceable. *Doe v. District of Columbia*, 93 F.3d 861, 866-67 (D.C. Cir. 1996); *Tony L. v. Childers*, 71 F.3d 1182, 1188-89 (6th Cir. 1995). That version required that in order to qualify for a grant, a State *"shall provide* that upon receipt of a report of known or suspected instances of child abuse or neglect," the State would initiate an investigation and take immediate steps to protect the abused or neglected child. 42 U.S.C. § 5106a(b)(2) (1988) (emphasis added). Despite this mandatory language, both circuits held that CAPTA was not privately enforceable because it did not "mandate a particular means of investigation or state what type of actions *must* be taken" to protect a child. *Tony L.*, 71 F.3d at 1189; *see also Doe*, 93 F.3d at 867. The Sixth Circuit also observed that "Congress wanted to leave states a certain amount of discretion in this area." *Id.*

In 1996, the language of CAPTA was changed substantially. The current version requires each State receiving a grant to submit a plan that "specifies the areas of the child protective services system" that the State will address with its grant money. 42 U.S.C. § 5106a(b)(1)(A). That plan must "contain a description of the activities that the State will carry out," including, as detailed above, a certification that the State is enforcing a law or operating a program that includes provisions and procedures requiring the appointment of guardians ad litem. 42 U.S.C. § 5106a(b)(2)(B)(xiii).

Every federal district court to consider the question has found that the more recent versions of CAPTA do not satisfy the *Blessing* test.[12] *See, e.g.*, *Charlie H.*, 83 F. Supp. 2d at

---

[12]The current version (as amended in 2010) is substantially similar to the other versions that have been in place since the significant changes made in 1996.

496-97; *A.S. v. Tellus*, 22 F. Supp. 2d 1217, 1224 (D. Kan. 1998); *Jeanine B.*, 967 F. Supp. at 1118. These courts have generally agreed that CAPTA's requirements have too broad a focus to create individual, enforceable rights. At least one district court has emphasized that the current version presents a weaker case for private enforcement than the prior version. *Jeanine B.*, 967 F. Supp. at 1118.

**[23]** We agree with this reasoning and affirm the district court's decision below. Unlike the case plan and records provisions of the CWA, the guardian ad litem provision of CAPTA does not contain the unambiguous rights-creating language necessary to satisfy the first prong of the *Blessing* test. As discussed above, when Congress wrote the CWA, it incorporated detailed requirements for what a child's case plan or health and education record must include and how those records must be incorporated into a case review system. In contrast, CAPTA gives little specific guidance, requiring only that a State either enact a law or create a program that includes procedures designed to accomplish broad goals, such as representation for every child by a guardian ad litem.[13]

**[24]** This approach leads us to conclude that Congress intended to focus on "the aggregate or systemwide policies and practices of a regulated entity[,]" rather than "individual rights to benefits." *Watson*, 436 F.3d at 1159 (citing *Gonzaga*, 536 U.S. at 287-88). Our conclusion is bolstered by CAPTA's legislative history, which explains that Congress intended "to ensure that States are responsible for planning and implementing the essential elements of an effective and efficient child protective service system without placing undue administrative burdens on States." S. Rep. No. 104-117, at 13 (1995). We thus affirm the district court's dismissal of Count Nine on the basis that the guardian ad litem provision is not enforce-

---

[13]Also in contrast to the CWA, the "*Suter* fix" does not apply to CAPTA, which is codified in Chapter 67 of Title 42 rather than Chapter 7. *See supra* note 9.

able through § 1983. We need not consider the district court's alternative holding that *Younger* abstention was appropriate.

### 4. CAPTA and IDEA: Early Intervention Services (Count Ten)

Count Ten seeks injunctive relief on behalf of a class of foster children who were not referred to early intervention services for which they were eligible. It seeks to enforce provisions of both CAPTA and IDEA that require States to refer certain children to early intervention services. The CAPTA provision, 42 U.S.C. § 5106a(b)(2)(B)(xxi), provides:

> A State plan . . . shall contain a description of the activities that the State will carry out using amounts received under the grant . . . , including . . . an assurance in the form of a certification by the Governor of the State that the State has in effect and is enforcing a State law, or has in effect and is operating a statewide program . . . that includes . . . provisions and procedures for referral of a child under the age of 3 who is involved in a substantiated case of child abuse or neglect to early intervention services funded under Part C of the [IDEA].[14]

The IDEA provision requires a State to have "policies and procedures that require the referral for early intervention services . . . of a child under the age of 3 . . . who is involved in a substantiated case of child abuse or neglect[.]" 20 U.S.C. § 1437(a)(6)(A). The district court held that the CAPTA provision is not privately enforceable and that IDEA's comprehensive enforcement scheme precludes enforcement of that provision through § 1983. We affirm the decision of the district court.

---

[14]At the time Plaintiffs filed their complaint, this was codified at 42 U.S.C. § 5106a(b)(2)(A)(xxi).

**[25]** Our analysis of the CAPTA guardian ad litem provision applies with equal force to the early intervention provision. Because Congress did not "unambiguously confer" an individual federal right, the early intervention provision fails the first prong of the *Blessing* test. *See Gonzaga*, 536 U.S. at 283.

**[26]** With respect to the IDEA claim, we have previously held that the IDEA has a comprehensive enforcement scheme that forecloses enforcement through § 1983. *Blanchard v. Morton Sch. Dist.*, 509 F.3d 934, 938 (9th Cir. 2007). Plaintiffs do not dispute this point, but they argue — for the first time on appeal — that they are seeking to enforce the IDEA claim not through § 1983, as their complaint alleges, but through the express cause of action contained in Part C of the IDEA (codified at 20 U.S.C. § 1439(a)(1)). Plaintiffs concede that IDEA's express cause of action requires parties to exhaust their administrative remedies. They urge us, however, to reverse the district court's dismissal; reinstate their IDEA cause of action; and allow Defendants to argue exhaustion as an affirmative defense on remand. *See Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 867 (9th Cir. 2011) (en banc) (holding that IDEA's exhaustion requirement is not jurisdictional and must be raised as an affirmative defense).

**[27]** This course of action would be inappropriate. The district court correctly applied the law to Plaintiffs' § 1983 claim and had no opportunity to decide whether Plaintiffs could proceed under IDEA's express cause of action. We thus affirm the district court's dismissal of Count Ten. If, on remand, Plaintiffs wish to pursue a claim under IDEA's express cause of action, they can seek leave to amend their complaint.

## C.   Assignment on Remand

Plaintiffs request that we reassign this case to a different district judge on remand. Our supervisory powers under 28 U.S.C. § 2106 permit reassignment when "unusual circum-

stances" are present. *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1118 (9th Cir. 2001). We consider three factors to determine whether unusual circumstances exist: (1) whether the original judge would have substantial difficulty in putting out of his mind previously expressed views or findings determined to be erroneous; (2) whether reassignment is necessary to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. *Id.* at 1118-19 (citing *United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 779-80 (9th Cir. 1986)).

Plaintiffs argue that reassignment is warranted under the first two factors because Judge Jones has prejudged the merits of the case and expressed hostility toward Plaintiffs' counsel. In support of this argument, Plaintiffs point to Judge Jones's comments during proceedings in this case as well as during an earlier, closely related case, *Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428 (D. Nev. May 14, 2007).[15]

**[28]** After thoroughly reviewing the record, as well as the transcripts from *Clark K.* submitted by Plaintiffs in their request for judicial notice, we conclude that reassignment is not necessary. We agree that Judge Jones occasionally expressed frustration with Plaintiffs' counsel and made a few troubling comments, especially concerning his willingness to approve a potential settlement or consent decree in *Clark K.* But those comments were not made during the present case, and our review of the entire record shows that Judge Jones gave genuine consideration to the arguments of both parties and provided a reasoned decision. There is no indication that

---

[15]In *Clark K.*, a different group of foster children who were also represented by the National Center for Youth Law brought a class action seeking injunctive relief against many of the same defendants named here. Judge Jones denied the motion for class certification. While an appeal of that denial was pending in our court, the parties stipulated to dismissal of the case with prejudice as to those particular plaintiffs.

Judge Jones is unwilling to follow our instructions on remand. In short, reassignment is an extreme remedy, and it is not warranted here.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the dismissal of Counts One, Two, Three, Eight, and Eleven; AFFIRM the dismissal of Counts Nine and Ten; and REMAND for further proceedings. On remand, the district court should allow Plaintiffs leave to amend their substantive due process claims, and Plaintiffs can seek further leave to amend if they wish to add a claim under the IDEA's express cause of action. Plaintiffs shall recover their costs on appeal.

**REVERSED in part, AFFIRMED in part, and REMANDED**.