**ORDERED PUBLISHED**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

In re:                              )   BAP No.   NV-12-1441-DKiCo
                                    )
WILLIAM F. NORDEEN and CAROL        )   Bk. No.   09-21273-LED
A. NORDEEN,                         )
                                    )   Adv. No.  11-01076-LED
                Debtors.            )
_____)
                                    )
WILLIAM F. NORDEEN; CAROL A.        )
NORDEEN,                            )
                                    )
                Appellants,         )
                                    )
v.                                  )   **O P I N I O N**
                                    )
BANK OF AMERICA, N.A., as           )
successor by merger to BAC          )
Home Loans Servicing, LP;           )
RECONTRUST COMPANY, N.A.,           )
                                    )
                Appellees.          )
_____)

Argued and Submitted on July 19, 2013
at Las Vegas, Nevada

Filed - August 9, 2013

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Bruce A. Markell, Bankruptcy Judge, Presiding
_____

Appearances:    Appellant Carol A. Nordeen argued pro se;
                David J. de Jesus, Esq. of Reed Smith LLP argued
                for appellees Bank of America, N.A., and
                ReconTrust Company, N.A.
_____

Before:  DUNN, KIRSCHER and COLLINS,[1] Bankruptcy Judges.

_____

   [1] Hon. Daniel P. Collins, Bankruptcy Judge for the District
of Arizona, sitting by designation.

DUNN, Bankruptcy Judge:

The appellants William F. and Carol A. Nordeen (the "Nordeens") appeal the dismissal of their Second Amended Complaint against BAC Home Loans Servicing, LP, fka Countrywide Home Loans Servicing LP ("BAC"), and ReconTrust Company, N.A. ("ReconTrust"), without leave to amend. Hereafter, BAC and ReconTrust are referred to collectively as "appellees."[2] We AFFIRM.

## I. FACTUAL BACKGROUND

The following factual narrative is derived from factual statements in the Nordeens' Second Amended Complaint and the exhibits thereto, and the bankruptcy court's Memorandum Decision Dismissing Complaint ("Memorandum Decision") basing its background discussion on facts alleged in the Second Amended Complaint.

### A. Loan History

On October 21, 2005, the Nordeens signed a promissory note for $140,000 (the "Note"), payable to Countrywide Home Loans, Inc. ("Countrywide"). The Note provides that: "[The Nordeens] understand that [Countrywide] may transfer this Note. [Countrywide] or anyone who takes this Note by transfer and who is entitled to receive payment under this Note is called the 'Note Holder.'"

To secure their payment obligations under the Note, on

---

[2] BAC Home Loans Servicing, LP merged with Bank of America, N.A. in July 2011.

-2-

October 21, 2005, the Nordeens also signed a deed of trust (the "Trust Deed") against their rental property in Surprise, Arizona (the "Property"). ReconTrust is the trustee named in the Trust Deed, under which the Nordeens "irrevocably grant[ed] and convey[ed]" the Property "in trust, with power of sale." The named Trust Deed beneficiary was Mortgage Electronic Registration Systems, Inc. ("MERS"), which was identified as "acting solely as a nominee for [Countrywide] and [Countrywide's] successors and assigns."

The Trust Deed expressly provides:

Borrower [the Nordeens] understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender [Countrywide] and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, releasing and canceling this Security Instrument.

The Trust Deed further provides:

The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

On October 30, 2005, the Note was sold to the CWALT 2005-

-3-

73CB REMIC Trust ("CWALT").

In December 2008, the Nordeens were unable to make their monthly Note payment, apparently as a result of defaulting tenants leaving the Property in such bad shape that significant, costly repairs were required. The Nordeens contacted Countrywide to see "if they could work anything out," but Countrywide's representative "said they could do nothing." On January 16, 2009, BAC mailed the Nordeens a notice of intent to accelerate the Nordeens' payment obligations under the Note. The Nordeens have not made a payment on the Note obligation since December 2008.

On March 23, 2009, ReconTrust initiated foreclosure proceedings with respect to the Property. On May 29, 2009, the Nordeens sent what they characterized as a Qualified Written Request under RESPA[3] to BAC and ReconTrust.

ReconTrust initially responded to the Nordeens' request for information. In its response, ReconTrust apparently included

---

[3] For purposes of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617, a "qualified written request" consists of:

> [W]ritten correspondence, other than notice on a payment coupon or other payment medium supplied by the [loan] servicer, that–
> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).

-4-

copies of the Note and Trust Deed and a payment history corresponding to the Nordeens' account. ReconTrust also explained that, despite the Nordeens' apparent assertions to the contrary, the Note and Trust Deed remained enforceable as written. Ultimately, in response to further communications from the Nordeens over a number of months, BAC apparently advised the Nordeens that payments on the Note were due and owing for December 2008 through April 2010, and a foreclosure sale was scheduled for May 18, 2010. No foreclosure sale of the Property has occurred to date.

**B.  Bankruptcy Proceedings**

On June 28, 2009, the Nordeens filed for protection under chapter 13 of the Bankruptcy Code.[4] On August 7, 2009, BAC filed a proof of secured claim in the Nordeens' bankruptcy case.

On March 3, 2011, the Nordeens, acting pro se, filed an adversary proceeding complaint ("Initial Complaint") against the appellees. In the Initial Complaint, the Nordeens asserted claims for declaratory relief, fraud, quiet title, and violations of RESPA, the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1667f, and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p. A prominent feature of the Initial Complaint was the Nordeens' theory (the "Securitization Theory") that the securitization of the Note and sale to CWALT constituted

---

[4] Unless otherwise indicated, all chapter and section references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

-5-

a "true sale" of the Note that vitiated its effectiveness as to them and rendered the Trust Deed unenforceable as to the Property. The Nordeens also argued that the appellees had somehow fabricated the version of the Note that they were trying to enforce against the Nordeens.

On June 6, 2011, the appellees moved to dismiss the Initial Complaint with prejudice under Civil Rule 12(b)(6). After a hearing on the motion on July 26, 2011 ("July 26th Hearing"), the bankruptcy court granted the motion to dismiss in part but granted the Nordeens leave to amend their complaint. At the July 26th Hearing, after hearing argument from the parties, the bankruptcy court rejected the Nordeens' Securitization Theory but granted the Nordeens leave to amend their claim for declaratory relief "so you can sort out who's got what note." The Nordeens' other claims were dismissed without leave to amend. On August 8, 2011, the bankruptcy court entered its order on the appellees' motion to dismiss the Initial Complaint, providing that "Defendants' Motion is GRANTED; IT IS FURTHER ORDERED that the Plaintiffs shall have leave until August 26, 2011 to file an amended complaint to assert a declaratory relief action; . . . ."

On August 8, 2011, the Nordeens moved for reconsideration of the bankruptcy court's order on appellees' motion to dismiss and filed a "disapproval to order on motion to dismiss that attorneys have done for the court." The Nordeens further filed a first amended complaint ("First Amended Complaint") on August 26, 2011.

The bankruptcy court held a hearing on September 13, 2011 ("September 13th Hearing"), to consider outstanding issues between the parties, including the Nordeens' motion for

-6-

reconsideration of the prior dismissal order. At the September 13th Hearing, the bankruptcy court reiterated to the Nordeens that claims based on their Securitization Theory were not viable. They could replead a more limited declaratory relief claim based upon their allegations that the appellees were trying to collect on the wrong Note. However, if the Nordeens wanted to assert additional claims for relief, they would need to file a motion to amend their complaint. But, the bankruptcy court cautioned, "You [the Nordeens] can't bring back the causes of action I've already dismissed." Ultimately, the bankruptcy court granted the Nordeens leave to file a second amended complaint.

The bankruptcy court entered an order denying the Nordeens' motion for reconsideration of the order on appellees' original motion to dismiss (the "Reconsideration Order") on September 21, 2011. In the Reconsideration Order, the bankruptcy court granted the Nordeens until October 11, 2011 to file their second amended complaint but further ordered that "no further leave to file additional amended complaints shall be granted."

On October 11, 2011, the Nordeens filed their second amended complaint ("Second Amended Complaint"). In the Second Amended Complaint, the Nordeens again focused on their Securitization Theory, asserting claims under that umbrella for declaratory relief, fraud, perjury, "material facts as to contracts, securities, and as to pleading, and practice," "federal laws UCC-3 [and] UCC-9," "possible collusion, RICO Act[5] and possible

[5] The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

-7-

counterfeiting," and "housing laws."

The appellees filed an answer to the Second Amended Complaint on November 8, 2011. Following substantial discovery, on May 8, 2012, the appellees moved for judgment on the pleadings ("Pleadings Judgment Motion") under Civil Rule 12(c). The Nordeens filed an opposition to the Pleadings Judgment Motion on May 29, 2012, to which the appellees replied on June 5, 2012.

The bankruptcy court heard the Pleadings Judgment Motion on June 12, 2012 ("June 12th Hearing"). At the June 12th Hearing, after hearing argument from the parties, the bankruptcy court took the Pleadings Judgment Motion under advisement. On August 10, 2012, the bankruptcy court issued its Memorandum Decision. On the same date, for the reasons stated in the Memorandum Decision, the bankruptcy court entered an order dismissing the Second Amended Complaint with prejudice. The Nordeens filed a timely Notice of Appeal on August 23, 2012.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(1) and (b)(2)(B), (K) and (O). We have jurisdiction under 28 U.S.C. § 158.

## III. STANDARDS OF REVIEW

We review a bankruptcy court's decision to grant a motion to dismiss an adversary complaint on the pleadings de novo. Henry A. v. Willden, 678 F.3d 991, 998 (9th Cir. 2012); Movsesian v. Victoria Versicherung AG, 670 F.3d 1067, 1071 (9th Cir. 2012) (en banc). De novo means that we examine a matter anew, as if no decision previously had been rendered, giving no deference to the bankruptcy court's prior determinations. Dawson v. Marshall, 561

-8-

F.3d 930, 933 (9th Cir. 2009). "We accept as true all well pleaded facts in the complaint and construe them in the light most favorable to the nonmoving party." Henry A. v. Willden, 678 F.3d at 998 (citation omitted).

We review the bankruptcy court's decision to dismiss an adversary complaint without leave to amend for an abuse of discretion. Id. A bankruptcy court abuses its discretion only if it applies the wrong legal standard or if its factual findings are illogical, implausible or without support in the evidentiary record before it. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).

We may affirm the bankruptcy court's decisions on any grounds supported by the record. Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008).

## IV.  ISSUES[6]

1.  Did the bankruptcy court err in applying an incorrect legal standard to its review of the Second Amended Complaint in granting the Pleadings Judgment Motion?

2.  Did the bankruptcy court err in considering the Pleadings Judgment Motion and granting it after the appellees had answered the Second Amended Complaint and the parties were preparing for trial on September 24, 2012?

3.  Did the bankruptcy court err in rejecting the Nordeens' Securitization Theory?

4.  Did the bankruptcy court err in dismissing the Nordeens'

---

[6] The following twelve issues are distilled down from the nineteen issues stated over five pages in the Nordeens' opening brief.

-9-

claim for declaratory relief based on the appellees' alleged fabrication of the Note?

5. Did the bankruptcy court err in dismissing the Nordeens' fraud claims?

6. Did the bankruptcy court err in dismissing the Nordeens' perjury claims?

7. Did the bankruptcy court err in dismissing the Nordeens' UCC claims?

8. Did the bankruptcy court err in dismissing the Nordeens' RICO claims?

9. Did the bankruptcy court err in dismissing the Nordeens' TILA claims?

10. Did the bankruptcy court err in dismissing the Nordeens' RESPA claims?

11. Did the bankruptcy court err in dismissing the Nordeens' FDCPA claims?

12. Did the bankruptcy court err in dismissing the Second Amended Complaint with prejudice?

## V.  DISCUSSION

**1) <u>Standards for consideration of a motion to dismiss</u>**

As the bankruptcy court noted in the Memorandum Decision, it "evaluates motions for judgment on the pleadings under Rule 7012(b), which incorporates Civil Rule 12(c)."  Rule 7012(b) (Civil Rule 12(b)-(i) apply in adversary proceedings in bankruptcy).  Where the defense of failure to state a claim upon which relief can be granted is raised in a Civil Rule 12(c) motion, the legal test applied is the same as if the defense had been raised earlier in a motion to dismiss under Civil Rule

12(b)(6). <u>McGlinchy v. Shell Chemical Co.</u>, 845 F.2d 802, 810 (9th Cir. 1988).

In reviewing the bankruptcy court's dismissal of the Second Amended Complaint, we start from the proposition that complaints prepared by pro se parties must be construed liberally, and we have a duty to ensure that "pro se litigants do not lose their right to a hearing on the merits of their claim due to ignorance of technical procedural requirements." <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1990). As stated by the Supreme Court in <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976):

> As the Court unanimously held in <u>Haines v. Kerner</u>, 404 U.S. 519 (1972), a pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" (Citations omitted.)

However, no matter how a complaint is worded, ultimately it must state a legally cognizable claim entitling the claimant to some relief in order to survive a motion to dismiss. See <u>id.</u> at 107 ("Even applying these liberal standards, however, Gamble's claims against Dr. Gray, both in his capacity as treating physician and as medical director of the Corrections Department, are not cognizable under § 1983.").

Civil Rule 8 sets forth general rules for pleading in federal court litigation. "The pleading provisions in the Civil Rules are intended to provide parties with adequate notice of the opposing party's claims or defenses." <u>Charlie Y., Inc. v. Carey (In re Carey)</u>, 446 B.R. 384, 391 (9th Cir. BAP 2011). Civil Rule 8(a)(2), applicable in adversary proceedings in bankruptcy under

Rule 7008, provides that a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

The factual allegations in a complaint "must be enough to raise a right to relief above the speculative level," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must be sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. The bankruptcy court explicitly recognized the application of these standards to its consideration of the Pleadings Judgment Motion. See Memorandum Decision, at pp. 6-7. It also recognized, however, that although it was required to "take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (A claim for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.").

The bankruptcy court clearly applied the correct legal standards to its consideration of the Pleadings Judgment Motion. The Nordeens complain in the statement of issues in their Opening Brief that the bankruptcy court treated all of their factual allegations as "nothing more than labels and conclusions and mere

-12-

conclusory statements or legal characterizations cast in the form of factual allegations." Appellants' Opening Brief, at 1. Yet, nowhere in their Opening Brief do the Nordeens cite one example of where the bankruptcy court erred in so characterizing their factual allegations as legal conclusions. We perceive no such error in the bankruptcy court's consideration of the Nordeens' factual allegations in its analysis set forth in the Memorandum Decision.

## 2) **Timing of the bankruptcy court's consideration of the Pleadings Judgment Motion**

Although their argument as to the timing of the bankruptcy court's consideration of the Pleadings Judgment Motion is less than clear (see Appellants' Opening Brief, at 1 and 11-12), the Nordeens appear to argue that the bankruptcy court erred in considering the Pleadings Judgment Motion after 1) all of the pleadings had been settled, 2) the parties had agreed on a scheduling plan and had engaged in substantial discovery, and 3) September 24, 2012 had been set as the trial date. In essence, the argument is, after all that had been accomplished in the adversary proceeding, the bankruptcy court should have tried it rather than dismissing it in response to the Pleadings Judgment Motion.

Civil Rule 12(c) provides that, "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." (Emphasis added.) We emphasize that under Civil Rule 12(c), it was not for the bankruptcy court to raise the issue of the appropriateness of granting judgment on the pleadings sua sponte. Under the rule, the bankruptcy court

-13-

could not consider such a motion until brought by an interested party, in this case, the appellees. The bankruptcy court did not consider the Pleadings Judgment Motion until after it was filed, the Nordeens had an opportunity to respond, and the bankruptcy court heard argument at the June 12th Hearing. The bankruptcy court's decision to grant the Pleadings Judgment Motion with prejudice did not "delay" the trial. Rather it avoided a trial that the bankruptcy court determined was unwarranted because the Nordeens had failed to state a claim upon which relief could be granted. Based on this record, we conclude that the bankruptcy court did not err in acting consistently with the provisions of Civil Rule 12(c).

### 3) The bankruptcy court did not err in rejecting the Nordeens' Securitization Theory.

As early as the July 26th Hearing, the bankruptcy court advised the Nordeens that their Securitization Theory was not viable and dismissed the Nordeens' claims based on the Securitization Theory. Yet, in every iteration of their complaint filed since then, including the Second Amended Complaint that the bankruptcy court ultimately dismissed with prejudice, the Nordeens have extensively repeated their Securitization Theory allegations in the service of their ultimate objectives: "[The Nordeens] want to restraint [sic] all parties from ever going after [the Nordeens] again and to declare this contract [the Note and the Trust Deed] void." Appellants' Opening Brief, at 10. "[The Nordeens] want to prevent all parties from ever attempting to foreclose on us again." Appellants' Opening Brief, at 30.

-14-

The bankruptcy court did not err in rejecting and in dismissing the Nordeens' claims based on their Securitization Theory, and its rulings are consistent with repeated determinations of the district courts sitting in Nevada and Arizona and elsewhere in the Ninth Circuit. See, e.g., Albritton v. Tiffany & Bosco, P.A., 2013 WL 3153848, at *8 (D. Ariz. June 19, 2013); Hagos v. MTC Financial, Inc., 2013 WL 1292703 (D. Nev. March 29, 2013); Joson v. Bank of Am., NA, 2013 WL 1249714 (D. Nev. March 22, 2013); Banks v. Freddie Mac, 2013 WL 1182685 (D. Nev. March 20, 2013); Lowry v. EMC Mortg. Corp., 2013 WL 841326 (D. Ariz. March 6, 2013); Reyes v. GMAC Mortg. LLC, 2011 WL 1322775, at *2, *3 (D. Nev. April 5, 2011) and cases cited therein:

> [F]ive of plaintiffs' claims are based on the idea that securitization inherently changes the "existing legal relationship between the parties to the extent that the original parties cease to occupy the roles they did at the closing." . . . This argument has been rejected in this district, because the securitization of a loan does not in fact alter or affect the legal beneficiary's standing to enforce the deed of trust.

Joyner v. Bank of Am. Home Loans, 2010 WL 2953969, at *1, *5, *6 (D. Nev. July 26, 2010):

> Each of these ideas [based on the Securitization Theory] has been addressed on multiple occasions by this Court, weighed and found wanting.
> . . .
> This Court rejects the notion, as it has previously, that "transfer of a promissory note causes prior security instruments to auto-nullify unless reexecuted." (Citation omitted.)
> . . .
> Plaintiff has not tendered the amount owed on the loan. Rather, he argues that [Bank of America] received the full amount of the loan when it securitized the loan and therefore Plaintiff has no further obligations under the loan. This argument is completely without merit.

-15-

Das v. JPMorgan Chase Bank, N.A., 2012 WL 1658718, at *1 (D. Ariz. May 11, 2012); Kuc v. Bank of Am., NA, 2012 WL 1268126, at *3 (D. Ariz. April 16, 2012) ("[T]he theory that securitization renders the Deed of Trust unenforceable has been repeatedly rejected."); White v. Indymac Bank, FSB, 2012 WL 966638, at *6 (D. Haw. March 20, 2012) ("The argument that parties lose their interest in a loan when it is assigned to a securitization trust or REMIC has been rejected by numerous courts."); Washburn v. Bank of Am., N.A., 2011 WL 7053617, at *5 (D. Idaho Oct. 21, 2011) ("This is not a new battlefield. Several courts have rejected various theories that 'securitization of a loan somehow diminishes the underlying power of sale that can be exercised upon a trustor's breach.'" (citations omitted)); Lane v. Vitek Real Estate Indus. Group, 713 F. Supp. 2d 1092, 1099 (E.D. Cal. 2010) ("The argument that parties lose their interest in a loan when it is assigned to a trust pool has also been rejected by many district courts."). The Nordeens cite no contrary authority from court decisions.

The definition of a "security" in the Securities Exchange Act of 1934 is very broad and includes promissory notes. See 15 U.S.C. § 78c(a)(10); Marine Bank v. Weaver, 455 U.S. 551, 555 & n.3 (1982). However, until fairly recently, most promissory notes, including notes secured by mortgages on homes, were not considered to be securities. See, e.g., Reves v. Ernst & Young, 494 U.S. 56, 65 (1990), citing Exchange Nat'l Bank of Chi. v. Touche Ross & Co., 544 F.2d 1126, 1138 (2d Cir. 1976). Now, when a vast market has been established for mortgage-backed securities, that view seems quaint.

-16-

However, home loan borrowers are not purchasing an investment when they enter into a loan agreement to purchase or refinance a home. When they sign a promissory note and mortgage or trust deed secured by their real property, they are entering into a contract for a loan transaction on fixed terms, and any "upside" or investment incentive to enter into the transaction is based on a prospective increase in the value of the subject real property. Accordingly, the borrower's loan contract (the Note and Trust Deed in this appeal) is distinct and separate from any securities transaction in the "secondary market" encompassing assignment of the contract. The Note in this case documents this distinction in its provisions that, "[The Nordeens] understand that [Countrywide] may transfer this Note. [Countrywide] or anyone else who takes this Note by transfer and who is entitled to receive payments under this Note is called the 'Note Holder.'" Likewise, the Trust Deed provides that, "The Note or a partial interest in the Note (together with this Security Instrument) <u>can be sold one or more times without prior notice to Borrower</u>." (Emphasis added.) This distinction between the "loan" contract and the "securitization" contract has been recognized by the courts that have rejected the Securitization Theory. <u>See, e.g.</u>, <u>Reyes v. GMAC Mortg. LLC</u>, 2011 WL 1322775, at *3:

> Since the securitization "merely creates a 'separate contract, distinct from [plaintiffs'] debt obligations'" under the note and does not change the relationship of the parties in any way, plaintiffs' claims arising out of the securitization fail. <u>Commonwealth Prop. Advocates, LLC v. First Horizon Home Loan Corp.</u>, . . . 2010 WL 4788209, at *4 (D. Utah Nov. 16, 2010) . . . (quoting <u>Larota-Florez v. Goldman Sachs Mortgage Co.</u>, 719 F. Supp. 2d 636, 642 (E.D. Va. 2010). Further, <u>as plaintiffs consented to the securitization in the agreement by explicitly agreeing that they</u>

-17-

"understand that the [l]ender may transfer this [n]ote," their assertion that they did not consent also fails. See Suss v. JP Morgan Chase Bank, N.A., . . . [2010] WL 2733097, *6 . . . (D. Md. 2010) (court rejected plaintiff's argument that he did not consent to securitization because the note contained such consent). (Emphasis added.)

As long as a borrower in such circumstances makes all of the scheduled promissory note payments to a loan servicer, the contract functions seamlessly (at least theoretically), and the borrower may never know (or have any reason to know) who ends up owning the note. The problem arises, as in this case, when a borrower faces difficulties making loan payments and needs to enter into constructive negotiations with the lender to restructure the loan to make it work for both parties. As the Nordeens discovered, to their increasing frustration and anguish over time, it is difficult to make contact with decision makers for a securitized loan, and the reaction of loan servicer representatives in our experience often has been exactly the response the Nordeens received to their pleas: "We can do nothing." Foreclosure ensues.

Various attempts to amend the Bankruptcy Code to give bankruptcy courts the authority to modify mortgage or trust deed secured loans to reflect the reality of declining real property values have been made, without success to date. That leaves parties, like the Nordeens, in the situation where they often have no legal remedy to the perceived ills and unfairness resulting from the securitization of their Note and Trust Deed. While we are sympathetic to the Nordeens' plight, we agree with the bankruptcy court that claims based on the Nordeens' Securitization Theory are not viable in this case. As bankruptcy

courts, unfortunately, we have no general authority to require lenders or loan servicers to behave reasonably.

Contrary to the Nordeens' assertion that the bankruptcy court violated their rights to due process by not allowing them to present securitization-based claims (see Appellants' Opening Brief, at 2, 22-23), the bankruptcy court properly dismissed their Securitization Theory arguments that did not assert a legally cognizable claim.  The bankruptcy court clearly told the Nordeens at an early stage in the proceedings that their Securitization Theory claims were not viable and dismissed them, but the Nordeens kept pleading them anyway.

## 4) The Nordeens' further claims for declaratory relief based on alleged fabrications of the Note are not viable.

At the July 26th Hearing and the September 13th Hearing, the bankruptcy court considered and allowed the Nordeens to amend and restate their claim for declaratory relief based on their expressed concerns as to whom they owed an obligation to pay and issues as to alleged fabrication of the Note.  As noted by the bankruptcy court in the Memorandum Decision, at p. 8:

> Declaratory relief is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." McGraw-Edison Co. v. Preformed Line Products, Co., 362 F.2d 339, 342 (9th Cir. 1966) (citation and internal quotation marks omitted).

The problem for the Nordeens is that ultimately, shorn of the permeating Securitization Theory claims that we previously have concluded are not viable, the declaratory relief claim stated in the Second Amended Complaint has no substance.  Aside

-19-

from questions relating to who is entitled to enforce the Trust Deed obligations, discussed infra, the Nordeens rely on allegations that the appellees have produced a "false and fabricated" Note. Helpfully, the Nordeens attached as Exhibit O to the Second Amended Complaint a "Certified Copy of the Note that [the Nordeens] closed with [and signed] on October 21, 2005 and took . . . home with them" (the "Genuine Note"), and as Exhibit P to the Second Amended Complaint "the fabricated copy of [the Nordeens'] Note that has been presented in this court as the 'original' and as a 'copy'" (the "Bogus Note").

The differences between the Genuine Note and the Bogus Note are detailed by the Nordeens as follows: 1) In the upper left hand corner of the first page of the Genuine Note, it states "Prepared by MARGARITA RUIZ;" the Bogus Note states "Prepared by REMEDIOS BROWN." 2) The Nordeens assert that their initials are "different" and in different places on the two note exhibits. 3) The "supposed signatures" on the Bogus Note "are not the same." 4) The color of ink on the Bogus Note, presented as the original Note at the July 26th Hearing, is a "strange light blue." 5) There are orange highlighter marks under the signatures and initials on the Bogus Note. 6) The "Certification" on the Bogus Note is allegedly different from the "Certification" on the Genuine Note, as appearing to be "in a different place and appear[ing] to be signed by a different person." (Actually, the only "certification" on Exhibit O that we see is the "true copy" certification on page one of Exhibit O. No such certification appears on Exhibit P.) 7) Finally, "[t]here are other variations with completely different barcodes

-20-

and redactions and punch holes that could indicate multiple pledges or sales of this mis-represented [sic] fabricated Note but none that are the [Nordeens'] Certified copy from closing." Second Amended Complaint, ¶ 96-97, pp. 26-28; Exhibits O and P.

Conspicuously absent from the Nordeens' allegations in the Second Amended Complaint is any allegation that the terms of the Genuine Note and the Bogus Note are different in any respect. In addition, although the Nordeens cannot quite bring themselves to state that they signed the Note in their description of the Genuine Note, they admitted earlier in the Second Amended Complaint that they signed the Note. See Second Amended Complaint, ¶ 15, p. 6. The Nordeens further do not deny that the initials and the signatures on the Genuine Note are theirs. At the July 26th Hearing, counsel for the appellees addressed the differences between copies of the Note as follows:

> From what I can tell from looking at those notes, the major differentiations were things that happen when you copy notes that have been highlighted, when you copy notes where redactions have taken place, when notes get copied and placed in binders, and hole punches get put through the notes.
> I was hoping to put all of that to rest by bringing the original note with me today, and . . . .

July 26th, 2011 Hr'g Tr., at 29:7-13.

However, whatever explanation applies with respect to the alleged discrepancies between the Genuine Note and the Bogus Note noted by the Nordeens is beside the point in this appeal. What is important is the substance of the alleged differences, and as a bottom line matter, the Nordeens' allegations about different Notes make no substantive difference. See, e.g., Donaldson v. BAC Home Loans Servicing, L.P., 813 F. Supp. 2d 885, 894 (M.D.

-21-

Tenn. 2011) ("Plaintiff claims that the fact that [d]efendant is able to produce multiple copies of the alleged original documents 'with different markings, endorsements, bar codes, signatures, and etc.' is evidence that it does not possess any of the original documents. . . . The Court finds this argument to be meritless.").

Section 3-309 of the Uniform Commercial Code provides for enforcement of "lost, destroyed or stolen" promissory notes by a person not in possession of the original promissory note when the subject person was entitled to enforce the note when the loss occurred, and the terms of the note can be proved. See Nevada Revised Statutes ("NRS") § 104.3309.[7]

_____

[7] NRS § 104-3309, entitled "Enforcement of lost, destroyed or stolen instrument," provides in relevant part as follows:

1. A person not in possession of an instrument is entitled to enforce the instrument if:
(a) The person seeking to enforce the instrument:
       (1) Was entitled to enforce the instrument when loss of possession occurred; or
       (2) Has directly or indirectly acquired ownership of the instrument from a person who was entitled to enforce the instrument when loss of possession occurred;
. . .
2. A person seeking enforcement of an instrument under subsection 1 must prove the terms of the instrument and his or her right to enforce the instrument. If that proof is made, NRS 104.3308 applies to the case as if the person seeking enforcement had produced the instrument. . . .

Arizona law does not apply with respect to the Nordeens' declaratory relief claim based on the appellees' alleged fabrication of the Note. See n.7 infra. However, in any event,
(continued...)

-22-

Even if the original Note were lost, a point not conceded by the appellees, no proof of the terms of the Note is required because there is no difference in terms between the Genuine Note and the Bogus Note. As to the right to enforce, the Nordeens' allegations in that regard arise from their Securitization Theory that we previously have determined to be nonviable. The Nordeens do not challenge the form of the endorsement in blank on the alleged Bogus Note. While the Note was transferred at an early stage from Countrywide to CWALT, the record reflects that the Nordeens have always dealt with BAC, formerly known as Countrywide Home Loans Servicing LP, as their loan servicer, and ReconTrust has always served as the named trustee in the Trust Deed. In their opening brief, the Nordeens concede that BAC has operated as their loan servicer. Appellants' Opening Brief, at 16.

The bankruptcy court raised a red herring when it gave as one of the bases for its dismissal of the declaratory judgment claim "the absence of any allegation [by the Nordeens] that they have placed funds into a segregated account in anticipation of the day when the proper payee is revealed," but it did not err in concluding that the motivation of the Nordeens was to invalidate the Note so that any obligations reflected in the terms of the Note are unenforceable. See Memorandum Decision, at pp. 8-9.

[7](...continued)
Arizona Uniform Commercial Code law with respect to enforcement of "lost, destroyed or stolen" instruments is essentially the same as Nevada's. See Arizona Revised Statutes ("A.R.S.") § 47-3309.

-23-

The Nordeens have admitted as much.  See Appellants' Opening Brief at 10.  However, the claim for declaratory relief in the Second Amended Complaint is inadequate to accomplish that objective, and the bankruptcy court did not err in dismissing it.

**5) Fraud**

While, as we have emphasized above, we construe pro se pleadings liberally, Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir. 2010), Civil Rule 9(b), applicable in this adversary proceeding under Rule 7009, requires that, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir. 2003) ("It is established law, in this circuit and elsewhere, that [Civil] Rule 9(b)'s particularity requirement applies to state-law causes of action.").

Under Nevada law,[8] applicable in construing the Nordeens'

---

[8] The Nordeens reside in Nevada.  They signed the Note and Trust Deed in Nevada.  BAC sent the Nordeens their monthly billing statements and the notices of foreclosure on the Property to the Nordeens' residence in Nevada.  The Nordeens further filed their bankruptcy case and the subject adversary proceeding in Nevada.  In these circumstances, the bankruptcy court properly applied Nevada law, as the law of the forum, to the Nordeens' nonbankruptcy state law claims that do not relate specifically to rights to foreclose with respect to the Property. See, e.g., Hanna v. Plumer, 380 U.S. 460, 465 (1965) ("[F]ederal courts are to apply state substantive law and federal procedural law."); Vacation Vill., Inc. v. Clark Cnty., Nev., 497 F.3d 902, 914 (9th Cir. 2007); Vess v. Ciba-Geigy Corp. USA, 317 F.3d at 1103 ("[A] federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action . . . ."); Rubenstein v. Ball Bros., Inc. (In re New
(continued...)

-24-

fraud claim, the Nordeens bear the burden of proof to establish each of four elements:

> (1) a false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the misrepresentation.

Barmettler v. Reno Air, Inc., 114 Nev. 441, 446-47, 956 P.2d 1382, 1386 (Nev. 1998). An omission to state a material fact "which a party is bound in good faith to disclose is equivalent to a false representation, since it constitutes an indirect representation that such fact does not exist." Nelson v. Heer, 123 Nev. 217, 225, 163 P.3d 420, 426 (Nev. 2007) (internal quotation marks omitted). "Where an essential element of a claim for relief is absent, the facts, disputed or otherwise, as to other elements are rendered immaterial," and summary adjudication is appropriate. Bulbman, Inc. v. Nev. Bell, 108 Nev. 105, 111, 825 P.2d 588, 592 (Nev. 1992).

The Nordeens' allegations in support of their fraud claim reference various communications raising questions as to who was the Note Holder and who were the beneficiary and trustee under the Trust Deed. The alleged communications were made at various times in 2009 and 2010. Whatever confusion may have resulted

---

[8](...continued)
England Fish Co.), 749 F.2d 1277, 1280-81 (9th Cir. 1984) ("In deciding questions of state law, a bankruptcy court should apply the law that a court of the forum state would apply.") (emphasis added); Gen. Motors Corp. v. Eighth Jud. Dist. Ct. of Nev., 122 Nev. 466, 473-74, 134 P.3d 111, 116 (Nev. 2006).

-25-

from the alleged communications, the Nordeens cannot have relied on any of the alleged communications on October 21, 2005, when they signed the Note and Trust Deed.  And since they ceased making payments on the Note obligation in December 2008, they can assert no damages from the alleged communications.  They have not alleged that any of the payments they made on the Note obligation prior to December 2008 were misapplied.  Accordingly, the Nordeens cannot assert either that the allegedly fraudulent communications from the appellees induced actual reliance on their parts or that damages resulted therefrom, essential elements of a fraud claim under Nevada law.

The Nordeens argue that the bankruptcy court erred in applying Nevada law rather than federal law in considering their fraud claim.  We disagree.  See authorities cited in n.7 supra.  However, even if federal law applied, it would not help the Nordeens.

The federal standard for fraud is a five-element test: 1) misrepresentation, fraudulent omission or deceptive conduct by the offending party; 2) knowledge of the falsity or deceptiveness of the statement or conduct; 3) an intent to deceive; 4) justifiable reliance by the claimant on such statement or conduct; and 5) damage to the claimant proximately caused by claimant's reliance on such statement or conduct.  Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010); Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 35 (9th Cir. BAP 2009).  The claimant bears the burden of proof on each of those five elements.

The Nordeens face the same irremediable impediments to

-26-

stating plausible claims of reliance and proximate causation of damages under the federal fraud standard as they do under the Nevada state law fraud standard. Accordingly, the Nordeens' fraud claim was properly dismissed.

**6) Perjury**

The Nordeens allege that appellees committed perjury by filing a proof of claim in the Nordeens' bankruptcy case stating that BAC is a secured creditor. However, no civil claim for perjury is recognized under Nevada law. See, e.g., Jordan v. State ex rel. Dep't of Motor Vehicles & Public Safety, 121 Nev. 44, 68 n.51, 110 P.3d 30, 47 n.51 (Nev. 2005), overruled on other grounds, Buzz Stew, LLC v. City of N. Las Vegas, 124 Nev. 224, 228 n.6, 181 P.3d 670, 672 n.6 (Nev. 2008). Any alleged perjury committed in the filing of a claim in a bankruptcy case is subject to criminal sanctions under 18 U.S.C. § 152,[9] not to any private right of action by the Nordeens. Accordingly, the

---

[9] 18 U.S.C. § 152 provides in relevant part:

A person who –
    . . .
    (3) knowingly and fraudulently makes a false
    declaration, certificate, verification or
    statement under penalty of perjury as permitted
    under section 1746 of title 28, in or in relation
    to any case under title 11;
    (4) knowingly and fraudulently presents any
    false claim for proof against the estate of a
    debtor, or uses any such claim in any case
    under title 11, in a personal capacity or as
    or through an agent, proxy, or attorney;
    . . .
shall be fined under this title, imprisoned not more
than 5 years, or both.

bankruptcy court did not err in dismissing the Nordeens' perjury claim.

**7) UCC claims**

The Nordeens' Fifth Cause of Action is confusing to say the least. First, the claim is titled, "Federal Laws UCC-3 UCC-9." "UCC" refers to the Uniform Commercial Code, which is a model uniform act designed to harmonize the laws of sales and certain other commercial transactions among the fifty states. It has been adopted, with variations, by all of the states but has not been adopted as federal law by Congress. See, e.g., Bank of Am. Nat'l Trust & Sav. Ass'n v. United States, 552 F.2d 302, 303 n.1 (9th Cir. 1977); O'Neill v. United States, 50 F.3d 677, 684 (9th Cir. 1995) ("The Uniform Commercial Code is a source of federal common law and may be relied upon in interpreting a contract to which the federal government is a party." (Emphasis added.)).

In their Fifth Cause of Action, the Nordeens complain about various alleged misrepresentations made by the appellees "through the U.S. Mails" and presentation of the Bogus Note to the Nordeens, all following the sale of the Note to CWALT. See Second Amended Complaint, ¶ 167-70, p. 44. In light of those allegations, the Nordeens ask that the bankruptcy court void the Note and Trust Deed and enjoin the appellees from ever attempting to foreclose on the Property.

If the Nordeens' "UCC" claim can be interpreted as a state law Uniform Commercial Code claim, Arizona law applies. The Property is located in Arizona, and Arizona law applies to foreclosures on Arizona property. See Vasquez v. Saxon Mortg., Inc. (In re Vasquez), 228 Ariz. 357, 359-60, 266 P.3d 1053, 1055-

-28-

56 (Ariz. 2011) (en banc). However, under Arizona law, the Nordeens' UCC claim fails as a matter of law.

As recently concluded by the Ninth Circuit:

> The Arizona Supreme Court has definitively rejected the Zadroznys' argument that a trustee must comply with UCC provisions to pursue foreclosure proceedings. In Hogan, the Arizona Supreme Court explained that "[t]he UCC does not govern liens on real property. The trust deed statutes do not require compliance with the UCC before a trustee commences a nonjudicial foreclosure." Hogan [v. Washington Mutual Bank, N.A.], 277 P.3d [781,] 783 [(Ariz. 2012) (en banc), as amended] (citations omitted).

Zadrozny v. Bank of N.Y. Mellon, __ F.3d __, 2013 WL 3242528, at *6 (9th Cir. June 28, 2013).

To the extent that the Nordeens' Fifth Cause of Action relies on their Securitization Theory, we reject it for the reasons previously stated. To the extent that it reiterates their fraud and fabricated note claims, we likewise reject it for reasons previously stated. We discern nothing more of substance in the Nordeens' Fifth Cause of Action and conclude that the bankruptcy court properly dismissed it.

**8) RICO claims**

RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To plead a claim for relief under 18 U.S.C. § 1962(c), a plaintiff must assert "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co.,

-29-

473 U.S. 479, 496 (1985); Odom v. Microsoft Corp., 486 F.3d 541, 547 (9th Cir. 2007) (en banc).

For purposes of this appeal, we focus on the two elements of "a pattern" and "racketeering activity." A "pattern" "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). "Racketeering activity" encompasses "any act indictable under several provisions of Title 18 of the United States Code, and includes the predicate acts of mail fraud, wire fraud and obstruction of justice." Turner v. Cook, 362 F.3d 1219, 1229 (9th Cir. 2004). A claimant may seek civil relief for any RICO violation(s) resulting in injury to his or her business or property. 18 U.S.C. § 1964(c).

> To have standing under civil RICO, [a claimant] is required to show that the racketeering activity was both a but-for cause and a proximate cause of his injury. See Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 . . . (1992). Proximate causation for RICO purposes requires "some direct relation between the injury asserted and the injurious conduct alleged." Id.

Rezner v. Bayerische Hypo-Und Vereinsbank AG, 630 F.3d 866, 873 (9th Cir. 2010). Chaset v. Fleer/Skybox Int'l, LP, 300 F.3d 1083, 1086 (9th Cir. 2002) ("First, a civil RICO plaintiff must show that his injury was proximately caused by the [prohibited] conduct. Second, the plaintiff must show that he has suffered a concrete financial loss."), quoting Fireman's Fund Ins. Co. v. Stites, 258 F.3d 1016, 1021 (9th Cir. 2001).

The Nordeens' Sixth Cause of Action, titled "Possible Collusion, RICO Act and Possible Counterfeiting," falls far short of those standards. First, the Nordeens allege in conclusory fashion that "collusion or racketeering acts may have occurred."

-30-

(Emphasis added.) Second, the Nordeens do not allege any "concrete financial loss" to them or their property resulting from what the appellees may have done. The Nordeens embellish their claim with further fulminations against the appellees in light of their Securitization Theory. In their Opening Brief, the Nordeens' argument in support of their RICO claim is that "the [appellees] brought an active security into the court room and proffered it as [the Nordeens'] original Note. You cannot use a security as a Note when it is an active security." Appellants' Opening Brief, at 29. In short, the Nordeens do not state a civil RICO claim that is remotely plausible, and their Sixth Cause of Action was appropriately dismissed.

**9) Truth in Lending**

The purpose of TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). "Accordingly, [TILA] requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." Beach v. Ocwen Fed. Bank, 523 U.S. 410, 412 (1998).

While the Nordeens' claims do not appear to fit the TILA model, they ultimately are precluded by applicable statutes of limitations. The general limitations period that applies with respect to TILA claims is "one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). The Nordeens

-31-

did not initiate their adversary proceeding against the appellees until March 3, 2011. The Nordeens signed the Note and Trust Deed on October 21, 2005, more than five years earlier. The sale of the Note to CWALT occurred on October 30, 2005. If the TILA limitations period runs from October 2005, the one-year TILA limitations period ran years ago.

There is authority for the proposition that the TILA statute of limitations can be equitably tolled until the borrower has actual notice of the claimed TILA violation. See, e.g., King v. California, 784 F.2d 910, 914-15 (9th Cir. 1986). However, the Nordeens did not assert equitable tolling of the TILA limitations period in the Second Amended Complaint, and in any event, the Nordeens assert that they learned of the alleged "TRUE SALE" of their Note and Trust Deed "on January 16, 2009 and even more clearly on September 8, 2009," well over one year before they filed the Initial Complaint. Their TILA claim was not filed within the general TILA one-year statute of limitations.

To the extent that the Nordeens' TILA claim could be interpreted as a claim for rescission, a longer period of limitations applies. Under 15 U.S.C. § 1635(f), "An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor . . . ." The Supreme Court has held that "[15 U.S.C.] § 1635(f) completely extinguishes the right of rescission at the end of the 3-year period." Beach v. Ocwen Fed. Bank, 523

-32-

U.S. at 412.

The Ninth Circuit has held that an obligor's rescission under TILA is conditioned on the obligor repaying any amounts advanced by the lender. See, e.g., Yamamoto v. Bank of N.Y., 329 F.3d 1167, 1171 (9th Cir. 2003), cert. denied, 540 U.S. 1149 (2004); LaGrone v. Johnson, 534 F.2d 1360, 1362 (9th Cir. 1976). The Nordeens do not offer to repay any outstanding balance of the loan evidenced by the Note for purposes of implementing a rescission anywhere in the Second Amended Complaint, but even if they did, the three-year limitations period to exercise a right of rescission under TILA ran in 2008, before the Nordeens ceased making Note payments and years before they filed the Initial Complaint. The bankruptcy court did not err in dismissing the Nordeens' TILA claim as barred by applicable statutes of limitations.

**10) RESPA**

RESPA was designed to change the settlement process for the financing of purchases of residential real estate, resulting

> (1) in more effective advance disclosure to home buyers and sellers of settlement costs;
> (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services;
> (3) in a reduction in the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance; and
> (4) in significant reform and modernization of local recordkeeping of land title information.

12 U.S.C. § 2601(b).

RESPA requires loan servicers to provide borrowers with information concerning any transfers of loan servicing. See 12 U.S.C. § 2605(a)-(d). RESPA further requires that loan servicers

-33-

respond to borrower inquiries requesting "information relating to the servicing of such loan[s]." 12 U.S.C. § 2605(e)(1)(A). Such inquiries are submitted in the form of a "qualified written request." A qualified written request must contain information that will allow the loan servicer to identify the name and account of the borrower and "includes a statement of the reasons for the belief of the borrower . . . that the account is in error or provides sufficient detail to the [loan] servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B). Accordingly, RESPA concerns and encompasses issues with respect to costs and services related to the closing of home loans and loan servicer accounting for the borrower's loan payments and escrow charges.

Nothing in the Nordeens' Seventh Cause of Action (covering their claims under RESPA, TILA and the FDCPA) alleges how either of the appellees purportedly violated any provision of RESPA. Reading the Second Amended Complaint very broadly, the bankruptcy court interpreted the Nordeens' RESPA claim as a further iteration of their "challenge [to] the validity of their loan," i.e., the Note and Trust Deed, rather than as complaining about the economics of the settlement or servicing arrangements for their loan. We consider that interpretation as giving the Nordeens the benefit of a liberal interpretation of their Second Amended Complaint, and we see no error by the bankruptcy court in dismissing the Nordeens' RESPA claim based on that interpretation. See, e.g., Consumer Solutions REO, LLC v. Hillery, 658 F. Supp. 2d 1002, 1014 (N.D. Cal. 2009) (RESPA claim dismissed without leave to amend where the borrower disputed the

-34-

validity of the loan rather than any aspect of its servicing); MorEquity, Inc. v. Naeem, 118 F. Supp. 2d 885, 900-01 (N.D. Ill. 2000).

**11) FDCPA**

Under the FDCPA, "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e (emphasis added).  Under the FDCPA, the term "debt collector" generally is defined as,

> any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6).

The bankruptcy court dismissed the Nordeens' FDCPA claim because the appellees were not "debt collectors" subject to liability under the FDCPA for the following reasons: BAC is the servicer of the Nordeens' loan, and as such, BAC is not subject to liability under the FDCPA.  As Trustee under the Trust Deed, ReconTrust likewise is not subject to liability under the FDCPA, as foreclosing on real property under a deed of trust is not an act to collect a debt, as contemplated under the FDCPA.  See Hulse v. Ocwen Fed. Bank, FSB, 195 F. Supp. 2d 1188, 1204 (D. Or. 2002) ("Foreclosing on a trust deed is distinct from the collection of the obligation to pay money" and is "not an attempt to collect funds from the debtor.").

The bankruptcy court's decision is supported by the recent published opinion of the Ninth Circuit in Schlegel v. Wells Fargo

-35-

Bank, NA, ___ F.3d ___, 2013 WL 3336727 (9th Cir. July 3, 2013). In Schlegel, the plaintiffs sued Wells Fargo Bank, NA ("Wells Fargo"), the assignee of the promissory note and trust deed secured by their residence property, for alleged violations of the FDCPA and the Equal Credit Opportunity Act ("ECOA"). The district court had dismissed both claims for failure to state a claim upon which relief could be granted. Id., at *1, *2. The Ninth Circuit reversed the district court's dismissal of the Schlegels' ECOA claim but affirmed the dismissal of the FDCPA claim because Wells Fargo did not fit the definition of a "debt collector" under the FDCPA.

> The complaint fails to provide any factual basis from which we could plausibly infer that the principal purpose of Wells Fargo's business is debt collection. Rather, the complaint's factual matter, viewed in the light most favorable to the Schlegels, establishes only that debt collection is some part of Wells Fargo's business, which is insufficient to state a claim under the FDCPA. See Dougherty [v. City of Covina,] 654 F.3d [892,] 900-01 [(9th Cir. 2011)].

Id., at *3 (emphasis added).

Since the bankruptcy court's decision to dismiss the Nordeens' FDCPA claim is entirely consistent with the Ninth Circuit's analysis and conclusion that the FDCPA claim in Schlegel was appropriately dismissed, we perceive no error.

**12) Dismissal without leave to amend**

In this case, the Nordeens had three bites at the apple before the bankruptcy court dismissed their Second Amended Complaint with prejudice. The appellees filed a motion to dismiss the Initial Complaint, which the bankruptcy court granted. However, at the July 26th Hearing on the motion to dismiss, the bankruptcy court listened carefully to the Nordeens'

-36-

arguments and took great pains to explain to them what claims in their Initial Complaint were not viable and what claims might be plausibly stated. Then, in its order, the bankruptcy court granted the Nordeens leave to file an amended complaint for declaratory relief. Thereafter, the Nordeens filed a motion to reconsider the dismissal order and filed a First Amended Complaint that reiterated extensively the same Securitization Theory claims that the bankruptcy court had advised them at the July 26th Hearing were not viable. The bankruptcy court sorted through the issues between the parties at the September 13th Hearing, reiterating to the Nordeens that their Securitization Theory claims did not work but granting them leave to file a further amended complaint seeking declaratory relief and possibly asserting further claims. In its order denying the Nordeens motion for reconsideration, the bankruptcy court expressly authorized the Nordeens to file a second amended complaint but warned that "no further leave to file additional amended complaints shall be granted." The Nordeens filed their Second Amended Complaint, again based primarily on their Securitization Theory claims. The bankruptcy court ultimately dismissed the Second Amended Complaint with prejudice in response to the Pleadings Judgment Motion.

The Ninth Circuit addressed the standards for dismissing a complaint without leave to amend in its recent published opinion in <u>Zadrozny v. Bank of N.Y. Mellon</u>, __ F.3d __, 2013 WL 3242528, at *8 (9th Cir. June 28, 2013):

> Because the Zadroznys' claims . . . are factually and legally implausible, denial of leave to amend lay within the district court's discretion. <u>See</u> <u>Mirmehdi</u>

-37-

v. United States, 689 F.3d 975, 985 (9th Cir. 2012) ("[A] party is not entitled to an opportunity to amend his complaint if any potential amendment would be futile. . . ."), as amended (citation omitted). This is particularly true as the Zadroznys had a prior opportunity to amend their complaint. See Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1058 (9th Cir. 2011) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.") (citation and alteration omitted). (Emphasis added.)

Under this standard, we conclude that the bankruptcy court did not err in dismissing the Nordeens' Second Amended Complaint with prejudice. It is our perception that the bankruptcy court bent over backwards at several substantive hearings concerning the Nordeens' various complaints to explain to them what would work to state a plausible claim in a complaint that could be tried. Despite the bankruptcy court's best efforts, the Nordeens insisted throughout on filing complaints that shed much heat but little light on their potential claims and ultimately did not state any plausible claims under applicable law and pleading standards in a federal court. In light of the Nordeens' failures to state a plausible claim for relief through three prolix efforts after receiving substantial guidance from the bankruptcy court, we agree with the bankruptcy court that giving them a further opportunity to amend their complaint would be futile. The Second Amended Complaint was properly dismissed without leave to amend.

## VI.  CONCLUSION

Based on the foregoing analysis of the issues raised in this appeal under applicable law, we AFFIRM.

-38-